We'll hear argument next in Case 11-770, Shannon Bailey v. United States. Mr. Shanmugam. Thank you, Mr. Chief Justice, and may it please the Court. In Michigan v. Summers, this Court established a categorical exception to the default Fourth Amendment requirement of probable cause. Under Summers, officers executing a search warrant for contraband may detain individuals they encounter at the scene while they are in the course of executing the warrant. This case presents the question whether the Summers exception also permits officers to detain individuals who have left the scene before the warrant is executed. Because individuals who have left the scene do not pose an immediate threat to the safe and efficient completion of the search, the court of appeals erred by permitting their detention absent probable cause or even individualized suspicion. Its judgment should therefore be reversed. Sotomayor, the two tests, yours seem to be the immediate vicinity test, and the Second Circuit is a soon-as-practical test. Your adversaries point out that the Second Circuit test actually focuses on the police officer's conduct, which should be the focus of reasonableness or unreasonableness. Your test just creates an artificial line that is subject to as much play as the other. Why isn't the focus on police conduct the right focus? Well, let me explain, Justice Sotomayor, first, the sort of theoretical basis for why we're offering this line, and second, say a word about the comparative merits of the two tests. First of all, with regard to the theoretical basis for the line, our fundamental submission to this Court is that Summers does not create a police entitlement. It is instead a rule of necessity and should be confined to situations in which a detention serves search-related purposes. And in our view, the justifications for a detention evaporate once an individual has left the immediate vicinity of the premises. And again, that's because in those circumstances, a detention serves no interest in ensuring the safe and efficient completion of the search, because the individual poses no immediate threat to the safe and efficient completion of the search. And what is the immediate vicinity? How would you define that? Well, ordinarily, the immediate vicinity will be the physical bounds of the property. But there may be circumstances in which an individual who is just outside the physical bounds of the property should nevertheless be detained. Maybe. There certainly is. I mean, that was Summers, wasn't it? Well, in Summers itself, the individual was on the premises just outside the house that was going to be searched. And the officers were, in the government's words in that case, approaching the property. Scalia. Yeah. He wasn't on the premises. He was on the sidewalk, right? Well, he was actually on the property, because he was on a sidewalk that connected the front steps to the public sidewalk in front of the house. The officers were approaching the house, about to effect an action. He was in the curtilage of the house. He was pretty clearly within the curtilage, Justice Scalia. You said the difference is there's no immediate threat to the officers here. But there is a threat, I suppose. I mean, if he finds out about the search and comes back, if he sees the officers outside his dwelling, if there's somebody in the dwelling who can notify him, send him a message that the police are searching, and he can get his confederates and come back. It seems to me that you're requiring that there be a larger number of police present at the site conducting the search, being lookouts for anybody that might come back, being able to detain people who are leaving as they approach. There's no immediate threat, but there's certainly a threat. If anything, it's the government's approach that requires a greater number of officers at the site, because under the government's approach, you have the two officers who conduct the detention, while a separate group of officers execute the search. And it's really for that reason, Justice Scalia. Roberts Well, it requires more, unless they want the guy to get away, I guess, right? Shanmugam Well, let me say something about this prospect that the individual will return. We think that the appropriate analysis here is the analysis that this Court set out in Arizona v. Gantt. And this Court in Arizona v. Gantt suggested that where a categorical rule is involved, you have to look at the class of cases to which the rule would be extended to see if the justifications apply. Now, with regard to this class of individuals who have left the scene, we believe that it is simply unlikely either that such an individual who has left the scene will be aware of the presence of police or that such an individual will return in an effort that is right to serve. Kagan Well, what if he were aware, or what if there was reason to think he might be aware? Would you then allow the police to do what the police did here? Shanmugam Well, we wouldn't, and that's simply because we believe that this should be a categorical analysis. And so, again, you're looking at this entire class of cases where individuals have left the scene to determine whether the justifications for the Summers rule apply. Now, let me just point out to you that if you think that leaving the scene, in Justice Kagan's hypothetical, that he's leaving the scene with incriminating evidence, at that point, you have a Terry stop, and he's right at the scene, he's just leaving the premises at the end of the trial. And so, to provide a hypothetical that will hopefully put some meat on the boat,  evidence. Kennedy Well, the analysis under Terry is whether there is reasonable suspicion, a reasonable basis to believe that the individual is engaged in incriminating evidence. Kennedy What would you think generally in my hypothetical? There would be hundreds of other facts, but. Shanmugam Well, ordinarily, when an individual is seen leaving the scene, and suppose, let me provide. Kennedy Just before the search, yes. Shanmugam Well, of course, the individual who is leaving the scene doesn't necessarily know that the search is about to take place. And so, to provide a hypothetical that will hopefully put some meat on the bones of this issue, suppose that an individual leaves a house, and he actually sees police officers sitting in a car, whether marked or unmarked, outside the house, and it is clear that he has seen the officers, he waves at the officers, and then ambles down the street. I don't think that there would be any doubt but that that individual could not be detained unless he did something more, unless, for instance, he engaged in flight at that point, at which point he could perhaps be detained under Terry. And so we simply submit that the analysis should be no different in a situation in which the purpose, the reason why the officers are sitting outside the house is because another group of officers is about to execute the search warrant. Of course, that individual is not going to be detained.  But there is an open question in this case. It wasn't decided below, but it was raised. So you're arguing we shouldn't extend Summers, but that leaves this very case susceptible to the assertion that this was a legitimate Terry stop. That is correct, Justice Ginsburg. And just to be clear about how these two doctrines work together, our submission to this Court is that within the search zone, within the immediate vicinity of the premises, the rule of Summers applies so that if officers encounter an individual within that zone while they're in the process of executing the warrant, a detention is permissible absent probable cause or individualized suspicion. Outside that search zone, ordinary Fourth Amendment principles apply. And, of course, under the Fourth Amendment, detentions of persons have to be justified by some degree of individualized suspicion, probable cause for a full-fledged arrest, individualized suspicion for a more limited detention under Terry. Alitoso, what would you think of this situation? Officers have a no-knock warrant and they're at the house. They see somebody come out the door and start to go down the steps. It doesn't look like that person has noticed their presence. Now, they have the choice, if you prevail, of either rushing in and stopping the person within the curtilage, in which case they could detain the person, or they could allow the person to walk some distance outside of the site of the house and then stop the person, and that would allow them to execute the warrant without endanger, without enhancing the danger to them from potentially armed people inside or allowing the destruction of evidence. What, in that situation, what argues in favor of your rule that if they want to detain this individual, they have to rush in and stop him before he leaves the premises? The justifications articulated by this Court in Summers, Justice Alito, and in particular what we really believe are the primary justifications, first, minimizing the risk of harm to officers executing the warrant, and second, facilitating the orderly  And let me say a word about that. In that situation, officer safety is undermined by your rule because it requires them to stop the person on the premises and, therefore, tip off those inside potentially about their presence. But they also have the choice not to engage in a detention at all. And I think the fundamental problem with the court of appeals rule and with the government's submission to this Court is that it really entails the conclusion that once officers see the individual leaving the house, they have an entitlement to detain that individual, with the only open question being where and how they go about effectuating the detention. But we simply believe that the justifications for the detention don't attach to the individual. They are search-based justifications. And the mere fact that an individual is seen leaving a house that is about to be searched in our view is insufficient to give rise to reasonable suspicion. Kagan. Mr. Shanmugam, when you talk about the justifications in your brief and just now, you talk about two, but there were, in fact, three, and the third was flight. So how is it that that's dropped from your understanding of Summers? Well, we simply think, Justice Kagan, that that justification is insufficient standing on its own. And that is simply because the justification in preventing flight is different in kind from the other two justifications that we've been discussing. The other two justifications are truly special law enforcement interests, to use this Court's words in Summers. The interest in preventing flight, by contrast, is an ordinary law enforcement interest. And just as in my hypothetical, when the officers are sitting outside and they see an individual wander by, the mere fact that the individual saw the police and perhaps would therefore conclude that the police were on to him would not give rise to a basis for detention simply because that individual could subsequently flee, so, too, we think that preventing flight in and of itself is insufficient. That is the ordinary law enforcement interest that requires individualized suspicion. Sotomayor, can I come back to the facts that my colleagues have raised and break it down, implicating the Terry question? Here the officers had a report of something in the house, and they saw the defendant with two people leaving. I know Terry hasn't been decided, but why do you think, just to stop, not the detention, not the bringing them back to the house, why do you think that just stopping them was wrong? Under Terry. Under Terry. Sure. Well, and first of all, I should preface what I'm about to say by noting that the court of appeals itself didn't reach the Terry issue, and the government doesn't advance that issue. But the court below did. So that would be an issue that would be open on remand. And let me say why on remand. Excuse me. Just the stop would be a bit, but they did more than just stop them. Well, that's right. The stop and the intervention. Well, it goes back to if a police officer saw an individual leaving the house and was concerned about them tipping someone off, et cetera, what would be the problem with the officer stopping the person around the corner, holding them, making sure people got in, and then letting them go? And just to be clear, because there are the two separate issues, there's a question of the stop and the question of the detention. And there would be a separate question about whether under Terry a detention of a particular length might or might not be permissible. But as to the stop, the argument that we would make on remand if we were to prevail before this Court would be that here what you have is insufficient to meet the reasonable suspicion standard. And what I assume that the government would argue is that the combination of the search warrant and the fact that the individual was seen leaving the premises that were about to be searched and as to which there was probable cause to believe that contraband was present, and the fact that my client met the extremely generic description provided by the confidential informant would be sufficient to give rise to reasonable suspicion. Now, clearly, we don't think — I was just going to say, clearly, we don't think that either of those factors standing on its own would be sufficient. The question would be whether that combination of factors under the facts and circumstances of this case would be sufficient, and we would submit that that combination is insufficient as well. Ginsburg. If they did do a Terry stop, and in the process of that stop, the police officer got a call that said, we found lots of contraband guns in this house. At that point, they could have turned this Terry stop into an arrest, couldn't they? They could very well, with one caveat, and that caveat is simply that the circumstances under which the contraband is found might be relevant to the analysis of whether or not there is probable cause, because the question would be whether or not there is probable cause to believe that the individual constructively possessed the contraband at issue. Scalia. Mr. Shermangan, please help me. I don't understand why the Terry stop is at issue, inasmuch as there was not a Terry stop. I mean, what occurred here went well beyond a Terry stop, did it not? So what do you do? You slice the bologna that thin, you say, well, the first stop is a Terry stop. Oh, yes, he later went on to detain them for a long time and put handcuffs on them and take them back to the premises. What relevance does the Terry stop have? Well, that would be the additional question, whether the detention in this case, which did involve taking my client and the other individual, putting them in handcuffs, putting them in the patrol car and then taking them back to the scene, was permissible within the scope of a Terry stop. And I think that would also be an open question, and that would particularly be an open question in a number of these cases in which the detention, pursuant seemingly to Summers, occurs over a very lengthy period of time. Under Terry, of course, all of this is the same. Scalia, I guess I just didn't realize it, that it's an open question whether you can do that much in a mere Terry stop. Well, under Terry, officers may detain an individual for the period of time it takes for them to confirm or dispel the suspicion. And I think that there would be an open question as to whether or not, when officers are executing a search warrant, for the duration of the execution of the search warrant, that falls within the scope of that Terry test. Could you explain what you mean by the immediate vicinity? Is it based on property line? Is it some absolute distance from the entrance to the premises? Is it based on how far you could see from the site of the search? I think ordinarily it will be within the physical bounds of the property. So, but if, for instance, officers saw an individual coming out of his house and he walked out and he just happened to step off the curb into the road before the officers got to them, we would say that that would satisfy the immediate vicinity standard. Scalia, well, physical bounds of the property is too much. I mean, you know, what if it's a farm and it's a 50-acre farm? I think you're much better off, I think your submissions sometimes say immediate vicinity. Well, we propose to this Court the immediate vicinity standard in large part because it really is comparable to similar limits that this Court has adopted for other Fourth Amendment court procedures. I like that much better than boundaries of the property. Well, and to provide a couple of examples, under Maryland v. Bowie, the case that permits officers to conduct a protective sweep incident to an arrest, the Court permits officers to search the area immediately adjoining the place where the arrest occurs, and that has not proven to be a difficult standard to apply in practice. What is the actual difference? I mean, you have two officers, or three, if they go into the property and somebody is there, they can detain him, and Summers gives three reasons. One, as Justice Kagan pointed out, preventing flight in the event that impriminating evidence is found. We're considering now the case where instead of going and detaining the people, the people inside the house walk out and there are two officers in a patrol car or a police car. Okay. That seems to me identical, as you said. The last one is facilitating orderly completion of the search. That seems to me identical. So you want the person there so that he can open a drawer, so he can unlock a closet, et cetera. Okay. Identical. The third one, where there is the only place for difference, it seems to me, is minimizing the risk of harm to the officers. The risk of harm to the officers, I guess, if he goes into the house, is that, well, if they leave, they might come back, goodness knows, and they've seen that they're looking for the drugs, da, da, da. Or maybe they'll rush out, or maybe they'll be, goodness knows what. Now, here I can see a slight difference, but maybe not. I don't know. Maybe they'll come back. Maybe they noticed the people in the car outside. Maybe they didn't. Certainly the policemen don't know. And they might go in quicker. And then the others will be alerted. I mean, when you talk generally about a risk of harm to the police, it seems to me pretty close, if not identical. Okay. So what am I missing? You already said the first one is identical. I don't see how the third one could change. And what about the second? Well, I actually don't think that even the first one is identical. But look, we think that first and foremost, the interest in ensuring officer safety is really the paramount interest here. And we simply think that it is unlikely that an individual who is seen leaving the scene is either going to be aware of the presence of police or return to disrupt the search. How do you know that? They're sitting outside in the car. The government has not identified a single example of an individual who is seen leaving the scene who has returned to disrupt the search in that fashion. Indeed, the government makes a much more clear distinction. Sotomayor, and the government really tries to make a broader and more ambitious argument. The government tries to make the argument that an individual with a connection to the place to be searched could arrive at the scene while the search is ongoing,    argument here. And we think that even as to that broader category of cases, the government hasn't made a sufficient showing that those sorts of confrontations are a common occurrence, particularly in light of the routine that's often seen. Breyer, not just that, is that they might want to get in quicker to stop this person from leaving because he's the one who knows where the drugs are, at least that's what they think. Or they start to shout and alert the others. Or, I mean, I've never conducted such a search, you know, so I don't know the risks involved there. But I can see the possibilities, and probably you might have conducted them, but I don't know. So how am I supposed to answer this question? I haven't personally conducted any searches, Justice Breyer, but I can say that with regard to categorical rules, it is really incumbent on the government to make a showing as to why an extension of a categorical rule is required. If you have to offer all of them, it's not a categorical rule, it's a categorical rule. Roberts, you've talked about officer safety. What about the safety of others? Suppose the place being searched is adjacent to a playground and there are dozens of children playing in the playground. The police are worried they're going to shoot out and they want to detain the person. So they say, well, let's wait until he gets a block down the street and detain him there for the safety of the kids. That has to be a categorical rule. They can't do that? Officers will naturally take precautions in situations like that. They will go in with the great fear. Roberts, the precaution is let's wait until he's a block down the street, because it will be a lot safer. Can they do that and be covered by Summers or not? They cannot be covered by Summers, but what they can do is either follow the individual for the period of time during which they are executing the warrant, or they can detain that individual if he returns to the scene. And again, all of the examples that the government cites, and there aren't that many of them, but the examples that the government cites are examples of individuals who arrive at the scene and when they realize that their place of residence is being searched, they become obstreperous. And to the extent that there is a concern about the threat posed to the safety of officers in those circumstances, we would submit that the obvious solution is to make clear that Summers permits the detention of individuals who arrive at the scene. And officers routinely do establish perimeters when they are executing search warrants. And so when they came back, I mean, the scenario here is he was supposed to be driving his friend home, and he would have come back while the search was ongoing, but the police could apprehend anyone while the search is that sort of thing, while the search is ongoing. If he were to return to the scene while the search is ongoing, we believe that he Court of Appeals cases that have so held. What the government is really arguing for here is an even more ambitious rule, an additional layer of Fourth Amendment prophylaxis, if you will, that permits officers to detain an individual who is seen leaving the scene based on the possibility that they are going to return. The government has not come even close to making an empirical case as to why that additional layer of prophylaxis is required. Alitoso, what if the person comes out the door and walks and has walked 50 feet down the block within sight of the entrance at the time when the police are entering to make the arrest? Would that person be in the immediate vicinity? Well, I think that the natural limit on the immediate vicinity rule is imposed by the underlying justification, namely that officers should have the authority to encounter individuals, to detain individuals they encounter while they are in the course of executing the warrant. And so if in your hypothetical, Justice Alito, the search team is marching up to the house and they encounter the individual 50 feet away from that door or the property line while they are in the course of doing so, the justifications of Summers kick in at that point. That individual is aware of the fact that the police are about to search his house, and as such, that individual poses a threat to the safe and efficient completion of the search. Alitoso, does that mean that if the person is within sight of the entrance to the premises at the time when the police enter, then that person can be searched and be detained? We don't think that's necessarily a line-of-sight rule. So if you had an individual who was sitting out in front of a house six doors down, we don't think that that individual could be detained. Of course, in this case, my client was detained at least seven-tenths of a mile away. That's the issue. But that's the problem. The police have to know what they are supposed to do when they go in to search a house, all right? And they know that sometimes they can keep the people there. And you are saying, but they can't stop them from leaving if they are not — all of a sudden I'm a policeman, I don't know what to do exactly, because I don't know how to fill in that blank. And therefore, I might rush in. I don't know what to do. I see the recipe for a mess, and that's what's — and the mess could involve physical harm. And I don't think this is a recipe. Scalia, you're not saying that they can't stop them from leaving. Have you said that, that they can't stop them from leaving? They can't stop them from leaving if they blank. They can always proceed to execute the warrant when they see an individual leaving. And if they are in the course of executing the warrant, a detention is permissible. But let me say just one word about the issue of the administrability of the rule. Because, after all, what we're talking about here is a bright-line rule. And the very purpose of a Fourth Amendment bright-line rule is to provide guidance to courts and officers alike. It is true that one can posit difficult hypotheticals under our immediate vicinity standard. But it is also true that it is even easier to posit difficult hypotheticals under the as-soon-as-reasonably-practicable standard that the government advances, which really reintroduces the very case-by-case analysis that bright-line rules are designed to avoid. And in addition, it is entirely unclear to us what Fourth Amendment purpose that limitation serves, because it is not clear to us why it matters for Fourth Amendment purposes how quickly officers effectuate the detention. And just one last point that I'd like to make before reserving the balance of my time for rebuttal. The rule that the government seems to be advocating before this Court is really a much more ambitious rule than we've even been discussing this morning. The government seems to suggest that the government has the authority to detain any individual with a connection to the place to be searched. And I think that that is out of recognition, that an individual who happens to be at their workplace could just as easily return to the place to be searched as an individual who is seen leaving. In our view, that is an astonishing extension of the rule that this Court announced in Summers. And I would like to reserve the balance of my time. Roberts. Thank you, counsel. Mr. Wall. Mr. Chief Justice, and may it please the Court. Mr. Walsh, would you answer, direct your first response to that last issue? Because as I read your brief, you seem not to be accepting the Second Circuit's rule at all. You seem to be proposing what appears to me to be a much broader rule that says, at one point in your brief, you state that it is the occupant's observed connection to a home subject to a valid warrant, not his physical location at the time that he's detained that makes him subject to detention. Now, I know police, when they're executing warrants, often have an advance team that has been surveilling a home, sometimes for days, and they've got one officer sitting there, and they see who they think is the occupant leave, and the team doesn't arrive until 12 hours later. Is it your position that in that circumstance the officers are authorized to go to wherever the occupant is, the office, the – wherever he might be, his mother's home, and effect an arrest there? No, Justice Sotomayor. I appreciate the opportunity to start there, because I think Petitioner's reply brief and much of his argument today is devoted to a position the government's not taking. So let me be very clear. In the government's view, Summers is about current and recent occupants, people whom police, when they are executing a warrant, find at the home or see leaving the home in the process of executing a warrant. And the question here is, do the justifications apply equally as a departing occupant steps away from the home and onto a sidewalk, a yard, a couple blocks away? And I think my friend's answer to that has a wonderfully abstract quality to it that doesn't engage any of the realities on the ground. Justice Alito, your hypothetical is anything but. It comes very close to the facts of the Cochran case out of the Sixth Circuit. Police arrive at the scene. The occupant is known to carry a gun, and he has a guard dog. So rather than walk up to the door, they wait for him to leave. But by the time they can catch up to him, he's off of the bounds of the property, but he's still very close to the residence. They stop him. They take him back to the residence. He lets the officers in. He secures the dog, and they complete the search. I think that is a model law enforcement practice, and it is indistinguishable in any important respect from what went on in Summers. The justifications for detention apply equally to departing occupants when they are seen by officers leaving in the process of executing the warrant. But no, Justice Sotomayor, the government is not contending that other connections to the residence, other than that kind of observed connection by the officers, could justify a detention under Summers. Roberts Well, we don't have anything like that in this case. We have the getting into a car, driving almost a mile away, and being stopped at that point. Well, we do have, though, the officer seeing him departing the residence as they are executing the warrant. It's a no-knock warrant for a gun. And rather than stop him right outside the house, because they don't know who else will be inside. As they are executing the warrant, I don't remember, was the individual know that they were executing the warrant in this case? No. They had obtained the warrant. They had the team. So the danger to them is not at all like the situation with the dog and the armed guy just off the property. Mr. Chief Justice, I respectfully disagree, and the government would be happy to have this case decided by having the Court look at the Federal and State cases, look at the risks that are present in those cases, and deciding whether the interests of Summers are served in those cases. What we see in the cases is that, I mean, take this Ferry case, for instance. Petitioner is driving his friend home to meet a court-imposed probation curfew, and he is then returning to the house. I think the reasonable inference on the record is that he will be back in a matter of minutes. So please. Ginsburg. And Mr. John McGahn said they could stop him. They could stop anybody. The search is ongoing. Somebody approaches the house. The police can stop that person. But think how formalistic and odd that is, Justice Ginsburg, that the police see someone leaving, but if they can't catch up to him on the bounds of the property, which has no reasonable relationship to the warrant here, which was for the premises, not for the property. Scalia. But the threat is from anybody coming back to the house, not just the person who just left. And surely the police, when they are conducting a search, post guards to prevent people from coming in. They often do, Justice Scalia, but they don't do it. I assume they always do. It seems to me there is no special threat from the person who left the house. There is always a threat of somebody else coming into the house. Justice Scalia, certainly in urban areas they do. I think it's more difficult where you have smaller police departments in rural areas. But the government's not disputing that posting sentries is a good idea. That doesn't begin to take care of the most serious cases where people outside of the area of the search fire on or assault officers. So, for instance, in 2008. Sotomayor, missing the point, which is that's going to happen regardless, meaning that risk exists, whether the person left the minute you got there or a minute before or an hour before or two hours before. That's the whole point. Which is the risk is extant no matter what. Justice Sotomayor, there is no question that executing a warrant is dangerous and people can come onto the scene at any time. The question is do we want to increase that risk to officers? Here a Petitioner is leaving, he'll be back in a matter of minutes and they're searching for guns. Sotomayor, you don't know that in any search, meaning any time you do a search, you have no idea when the occupant, sometimes you know when the occupant is inside, you'll hear the TV or something else. But often you don't and you don't know if someone will come back and when. Just Sotomayor, I completely agree, although I think that's So why is seeing someone leaving increasing that risk? Because we know that some percentage of those people will come back. Some percentage will flee, which is one of the interests in Summers, which I think Petitioner does not take seriously. But some percentage of them will come back and some percentage of those returning occupants will harm officers. Scalia, if you have a large enough force that you can afford to send two of them in a car chasing this fellow for a mile, why can't you just post those two outside the house, just in case somebody, whether it's this person who's just left or anybody else, comes back? I mean, it seems to me that what you're positing is unlikely, namely, having sufficient personnel to follow these persons, but not having sufficient personnel to defend the premises against somebody entering. Justice Scalia, first, that isn't even arguably going to serve two of the three Summers' interests, preventing people from fleeing or garnering their assistance in the orderly completion of the search. But even if we Can you tell me what constitutional right entitles you to stop someone from, using the word fleeing, you certainly are entitled to stop someone with whom you have reasonable suspicion, but what constitutional right entitles you to stop a person who's just leaving in the normal act without reasonable suspicion? I think your question builds on the answer. What the Court said in Summers is when you see someone, you find someone at a home where you see them leaving, at a time when a neutral magistrate has determined there's probable cause to believe a crime is being committed inside, you have in the case, articulable and individualized suspicion to believe that that person is linked to the criminal activity inside the home. And so Well, Mr. Rule, you have that, too, about the person in her workplace, and you said that your argument didn't apply to the person in her workplace. So you have to come up with something better than that. And I guess the question is, your rule would seem to encompass, you know, a whole set of people who are leaving their houses for ordinary reasons. I'm going to work in the morning. And the question is whether the police can stop this person who's going to work in the morning, who's given no indication that he's seen the police officers at the scene, no indication that he's coming back immediately or, you know, in any amount of time that it will take you to complete the search. And that's not an outlier case. It seems to me that the hypothetical I just gave you might very well be the more common case than the hypothetical that you gave me. So, you know, why isn't this just too broad a categorical rule? Well, Justice Kagan, let me break that up into both parts. First, you know, as far as detaining people who have other connections to the home, I think you're right that some of the arguments that the Court adopted in Summers and that the government's making here could translate. And I think when those cases come to the Court, the Court will have to decide whether to recognize doctrines analogous to Summers or Terry in those contexts. But that's not what Summers is about. The connection that Summers discusses and approves is seeing someone leaving a home subject to a valid warrant for contraband. That's the only connection at issue here. The only connection that the Court can hold on to. Breyer. Is it in the process? Does Summers apply and does this apply only when the police are in the process of executing a valid search warrant? Yes, Justice Breyer. Even Petitioner, the way I read his briefs, concedes that if police had caught him outside the basement apartment or somewhere within the proper town. If the police, executing the valid search warrant, walked through the gate and at that moment the individual emerging from the house had not yet passed through the gate, then under Summers the police would have the right to detain him. All right. So the question here is he's walked through the gate. All right. Now, I guess the police are not seeing. The police objection is, I don't know, these things are complicated and we might not want to push him back. I don't know what the neighborhood is like and maybe somebody will get killed. I mean, that's the kind of argument. Justice Breyer, that is absolutely right. The government's central. I know you'd say that was right. The central contention is there's nothing magical about the gate for Fourth Amendment purposes. When he steps through the gate, he's just as much of a flight risk, a danger to officers and just as able to assist in the orderly completion. There is something magical about the gate or at least about the immediate facility of the house. What we're trying to apply here is an absolute rule to make it unnecessary for the officers to guess whether they can do this or that. And the rule you propose is, well, you know, a mile away. So what's your test? A reasonable? As soon as reasonably practical. As soon as reasonably practicable. You consider that an absolute test? I thought that the test we invented here was meant to help officers, to say this is the rule and you can do it. And you want to do anything else, use Terry or use normal probable cause principles, but this is an absolute rule governing the search of a home. It is an absolute rule and it tells you who. It gives you a who. Who's detainable. People we find. It doesn't give you a where. You need more than a who. You need a who and a where. Well, the who is categorical. People you find on the premises or you see leaving the premises at a time when a magistrate has determined there's probable cause to believe a crime is being committed inside. The where, the location, just like duration, just like use of force in the Mueller and Ratelli cases, those are subject to the general requirement of reasonableness under the Fourth Amendment. Ginsburg. Mr. Walton, the Summers case was an exception. The main rule is you have probable cause. So you're taking the exception, which was tied tightly to the house. We want him to stay on the premises so he can be at risk that he's going to disrupt the search. But it was an exception to the main Fourth Amendment rule. And now you're asking to have that exception spread. And so today you say, oh, well, we're not asking if the person gets to her workplace, the police. But maybe why not? I mean, it's one thing to confine Summers to the house, the immediate premises, and another to say seven-tenths of a mile away, that's okay, too. Mr. Walton. I think the reason Summers carved out the rule is it said, look, for current and recent occupants, as a class. We see the officers see, they find or see them at a residence where there's probable cause to believe a crime is committed. So across the board, we've got reasonable suspicion, and that's why we draw a rule, so that we're not going to rebalance every time. Kagan. But the across the board is a set of people who are at the house when you want to search the house. And of course, Summers makes perfect sense. You want to search the house. You can't have these people roaming around, right? So you have to detain the people. But what you're now saying is, well, there's another class of people. They're going to work in the morning. And we've – there's no indication that they've seen the police officers. They're going to work. But we get to detain them, too, just because we have a warrant to search the house. And the question is why? Justice Kagan, as far as we know, George Summers was going to work. I mean, George Summers was detainable, as was Petitioner here, on his view, if we had caught him within the physical bounds of the property. The question is not, you know, how to apply it in that circumstance. It's does something meaningful change when he hits the sidewalk or the neighbor's yard? I mean, something meaningful very much changes before you're dealing with a problem of a person on the premises while you're trying to search the premises. And now you're talking about a person who is going to work, leaving the premises, letting you search the premises without any interference. Justice Kagan, I don't think that explains why you couldn't let George Summers go on its way. And it doesn't explain why the Court in Summers didn't say, look, rather than roam the house, if it really is true that once we let you outside the front door or the front door, you're going to be a hindrance, why not give you the option to leave? Turn them out. Because on Petitioner's view, they're safe to go. And what the Court in Summers recognized is, no, important interests are served by detaining people in that circumstance. Ginsburg. Ginsburg. You have to draw a line someplace. When he's descending the steps to his house, he's still associated with the house. And once he steps over that line, the Summers rationale, it seems to me, doesn't apply. But there's a curiosity about this case, maybe you can explain it to me. They stop him seven-tenths of a mile away. By that time, the search is ongoing, they have found guns and contraband. They take — why did they take him back to the house? What was the reason for taking him? There was nothing there that he could — he couldn't obstruct the search, he was in handcuffs. He couldn't point out anything in drawers because they found it all? I mean, I think at that point, they had probable cause. They could have arrested him and I think they could have taken him down to the station house. They returned him to the scene instead. And I don't think there's any evidence in the record about why they took him back to the scene rather than straight to the station house. But, Justice Ginsburg, I do want to fight the premise a little bit. All that the government is asking for is for the Court to look through the Federal and State cases because we see the exact same interests were served in Summers. Kennedy, I think we have to take the case on the assumption, I agree with you, that probably was probable, but I think you have to take the case on the assumption that there was no probable cause to arrest because they didn't — they do not rely on that authority. Justice Kennedy, in that — assuming that's true, then they took him back to the scene to complete the search, by which time they had found the drugs and the guns, and then they did arrest him, and he has not claimed that at that point there wasn't probable cause for an arrest. But these risks are real, and they do play themselves out in the cases that are taken. Sotomayor, the problem with absolute rules, like we did in Summers, is that they are an exception, and they are absolute. Go back to the question you were asked by one of my colleagues earlier. Why wouldn't Terry give you all of the rights that you are seeking on the absolute rule, but subject your police conduct to the question of reasonableness, which is the normal standard of the Fourth Amendment? Of course, a very brief Terry stop could allow a departing occupant to go on his way long before the search is completed. And now he's fully aware of the police presence. So now I'm — I'm litigating for you. Sure. So imagine a — You can very easily imagine that what the fight's going to be like below is we stopped them because we saw them coming out of the house, and all we want to do is make sure that they don't return. So we're just going to hold them in place. We don't have to drag them in a car back to a place they just left. We're just going to stop them in place to get a phone call that everything's all clear. Well, I take one of the differences between Terry and Summers to be that in Terry, the seizure is tied to the officer's brief investigation, and in Summers it's tied to the execution of the warrant. Now, if what you're talking about is a Terry stop that could last for the duration of the warrant, I don't know that there is much of a difference, then, between Terry and Summers. Well, we don't know, but why don't we let that develop? Well, because I think the danger is that courts will apply Terry the way that they have, and we don't want to dilute one doctrine with another. A brief Terry stop could allow occupants to go on their way, but now they're aware of the police presence. Now they are much more of a risk to flee or harm officers. Ginsburg Could you explain to me, the police, they have the informant's tip, and they've seen him coming out of the house. So it seems to me it's a good case that that would be reasonable suspicion. Coming out of the house, he looks like what the informant says. Then they pat him down and they find these keys, and the keys are to the house. Justice Ginsburg, that's certainly true here. I was only saying to Justice Sotomayor, you can imagine a case where they execute the warrant and it takes them a while to find something, and in the meantime, they stop a deporting occupant, he's not carrying a gun, he answers the questions and does not arouse the officer's suspicion, and now he is on his way, and he is on his way while the search is ongoing, and now he knows about it. He's a key. Scalia So what? What's he going to do? He's going to phone them and say, hey, you know, you're going to be searched. The cops are crawling all around the house already. So the only realistic additional threat is that he is going to voluntarily go back to where the police are in the house? I mean, you know, this is so implausible. What harm, what threat to the policeman can possibly exist? I think the Texas officers in the Valdez case, which we cite in our briefs, would find it surprising where they did let someone go from the scene and she came back with an individual and started fighting with police. Look, I take Petitioner's point very unusual. Justice Scalia, it is true that only a foolhardy person would do it, but unfortunately that is a perfect description of many criminals who do not tend to be level-headed rational actors. Scalia We don't adopt absolute rules to cover foolhardy people. I mean, absolute rules are designed to cover the mind run of cases, the generality of cases, not the oddball case. That's not what you use an absolute rule for. That's absolutely right, Justice Scalia. And in the mind run of cases, what we know is that these people are leaving a home where there is probable cause to believe a crime is being committed. Police are detaining them a short distance away, and they are doing it in cases where people are fleeing or we can reasonably believe they would flee once they have seen officers if they were not detained. They are violent. They are aggressive. Some number of them can come back, and we can make reasonable predictions about what they would do. And they provide very valuable assistance. They secure guard dogs, like in the Head and Cochran cases where there were pitbulls and Dobermans. They allow police to – they give them keys so they don't have to affect forcible entry. Roberts And that's an argument in Summers I just don't understand. The argument is you can detain the people because they might want to give the officers assistance. Well, if they want to give them assistance, they don't have to be detained. Well, it seems odd, you know, we are going to tie you up, but we are going to keep you here. You can't leave because we think you might tell us where the drugs are. Cotugno Mr. Chief Justice, I mean, I think it is one of three legitimate law enforcement interests where you have someone for whom there is articulable and individualized suspicion to believe that they are connected to criminal activity. And I think the Court in Summers was absolutely right. You do find people securing guard dogs, moving families out of harm's way, providing keys so that officers don't have to break in and harm property or jeopardize third parties. You find them handing over contraband rather than endanger officers. Roberts If they want to do that, they can. The question is whether you can detain them in the hope that they will decide to help you or give you the key to the cabinet. Cotugno And the argument in Summers is you can detain them because you have got reasonable suspicion. The question is what are the interests served by the detention. And that is an interest served by detention. Now, we are not saying it's an independent basis to support it. These are people for whom as a class there is reasonable suspicion, which is why Summers carved out the rule that it did. Now, the situation in this case and the Federal cases that we are seeing are not meaningfully distinguishable from Summers. You have got the same reasonable suspicion, same law enforcement interests, same minimal intrusion. There is no – along no dimension is there a meaningful difference between this case and Summers. Kennedy Justice Kagan had the hypothetical of the person leaving to go to work. He is the 9 to 5 person. Suppose the warrant is going to be executed at 5. Can they detain him in his office so that he doesn't go back? He always goes right home. He takes the number 3 bus and he will be there in 20 minutes. Can you detain him at the office under your rule? Cotugno No, not under Summers. Now, whether they can Kennedy I don't know under the rule you are proposing. Cotugno I don't think so. I mean, when that case Kennedy I don't know why not under the rule you are proposing. Cotugno When that case comes to the Court, the Court will have to decide whether to recognize a doctrine analogous to Summers and Terry, and I will honestly admit that some of the arguments that the government is making here and that the Court adopted in Summers will translate, but Summers is not about that. Summers is about current and recent occupants, and those as a class have reasonable suspicion. Now, I think these other cases get harder. They will turn much more on what the connection was and the facts of a specific case. Sotomayor Counsel, I remain with my question, which is we have a circumstance-driven power, Terry. Your power is really going much more broadly, because you are basically saying that if probable cause exists to search a premise, it exists without being tied to an individual, because anybody who leaves the house, whether or not they have been tied to a crime in that house in the past or not, is now subject to being detained. So we have evidence that only a husband is involved in a fraud, and his wife is leaving for work because she was observed leaving the house. She can now be stopped a mile away. Mr. Sotomayor, to be clear, that's not the government's rationale. That's the rationale of the Court in Summers. Maybe the wife is aiding and abetting. We don't have any idea. Maybe the wife, you know, is implicit in the husband's crime in some way. The Court's point is that the wife is involved in the crime in Summers. Sotomayor, your view is that Summers gave you, entitled you to hold people merely for purposes of investigation, without any reasonable suspicion. That's really what your rule is. My view is what the Court said in Summers. It's appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant. And what the Court said is whether you're inside or whether you're on the front steps or the sidewalk like George Summers, that reasonable suspicion exists. The police have placed you in the home at a time when a neutral magistrate has determined there's probable cause. And to be clear, we're not trying to blow the doors off of this exception. This is a very narrow exception. What we see time and again in the Federal cases is the same fact pattern. Someone leaves a house, the police catch up to them within a mile, but usually just within a few blocks, and they return them to the scene. The police are not treating this as a sort of entitlement. This is not Gant, where the results are outstripping the rationale. Scalia, the seizure has to be reasonable under the Fourth Amendment, right? Now, the requirements for a warrant are not the outer bounds of what's reasonable. But nonetheless, it seems to me that what's reasonable under the Fourth Amendment can be estimated from what the Fourth Amendment requires a warrant to contain. And what a warrant must contain is a description of the place to be searched and the persons or things to be seized. And what you're arguing for is a special rule which says, once you have a warrant that this place can be searched, you can seize anybody, you can seize not only anybody there in order to protect the police, but anybody connected with the place. And that is so contrary to what seems to me the theory of the Fourth Amendment that I am very reluctant to extend our cases any further than they already exist. Justice Scalia, we're not here asking for the Court to extend Summers. We're just asking for a faithful application of what the Court said in Summers. And I understand that, you know, it would seem troubling were it not for the fact that the Court in Summers, I think, really walked through why, as a class, when you're inside the home or you're leaving the home, we've got reasonable suspicion that you're connected, and there are a number of good reasons why police can detain you while they execute the warrant. You're right, the Fourth Amendment does require reasonableness. And what the officers did here was imminently reasonable. They're executing a no-knock warrant at a drug stash house for a gun. They see someone leave who fits the description of the drug dealer, and rather than stop him right on the threshold inside the cartilage and risk alarming his Confederates, they let him drive a short distance away and they return him to the scene. There's no meaningful difference between that and if they had stopped him right outside the house. The only thing they would have done. Ginsburg. You said in this case you couldn't think of a reason why they took him back to the scene. Maybe he had a key to the place where they keep the drugs, the basement or something. He might have wanted to help in the search. Is that fanciful? Is it fanciful that people who are searched open doors or? Far from being fanciful. The Sherrill case out of the Eighth Circuit, the Sears case out of the Eleventh Circuit, they came back and they unlocked doors so the police wouldn't have to make forcible entry in Monteith out of the Fourth Circuit. But the question is whether you have to detain them to do something you're saying they'd want to do. Mr. Chief Justice, we're not here saying that every time somebody could be helpful in a search, you could go out and detain them. It is an exception to the normal probable cause requirement, but it's an exception analogous to Terry because you've got reasonable suspicion. And the question is there, okay, as a categorical rule, you know you've got reasonable suspicion for this entire group of people, current and recent occupants. What reasons do police have to detain them? And there are really good reasons. One, they tend to flee, and we see that in Cavazos out of the Fifth Circuit. Two, they provide assistance in the search. And three, they are often violent or aggressive individuals. I don't think it's irrelevant that the vast majority of search warrants for contraband are for guns and drugs, and you see a number of amici States in here saying, look, this is a legitimate and important law enforcement practice for officers in a very dangerous and volatile situation in executing these warrants. And I think Petitioner takes those risks way too lightly and will not, steadfastly refuses to engage the realities on the ground that we see in the cases. Judges in the Federal and State courts are grappling with this every day, and what these opinions reveal is that these risks cannot be so easily dismissed. They are serious and they are real, and we see them play themselves out across this entire set of cases. And what we don't see noticeably is the kinds of things that the Court tends to be worried about in Fourth Amendment cases, abuse and police entitlement. Again and again, you see police detaining departing occupants a very short distance from a residence, returning them, not prolonging the detention, not engaging in exploitative And to be clear, Petitioner's solution is more than just a solution in search of a problem. It carries its own problem. It is severely underinclusive. It will not capture any number of cases where there are valuable law enforcement interests to be served, and it will produce very silly results in a number of cases where police can't catch up to a departing occupant for one reason or another until after he's crossed some magical gate, and they will have to sit on their hands until he returns so that they can do exactly what they would have done minutes or hours earlier if they had been able to detain him. Ginsburg. He can follow him. They can, but, Justice Ginsburg, tailing is a very risky proposition, particularly in an urban area. And that doesn't even arguably begin to serve the interests in avoiding flight or facilitating efficient and orderly detention. Scalia. So all law enforcement would be a lot easier if we didn't have the doggone Fourth Amendment. I mean, the Fourth Amendment is an impediment to law enforcement. Of course it is. There's no doubt about that. Justice Scalia, if you start from the premise that the Fourth Amendment doesn't permit this, then I lose. But I think what the Court said in Summers is, what we've already drawn – this Court's already drawn a number of exceptions to the probable cause requirement in reasonable suspicion cases. This is another, and it serves very valuable interests in this case and others. Thank you, counsel. Mr. Shanmugam, you have three minutes left. Thank you, Mr. Chief Justice. Just a couple of points. First of all, having suggested in its brief that the police may detain any individual with a connection to the place to be searched under Summers, the government today falls back to the view that the police may detain any individual with an observed connection, suggesting that this Court can leave for another day the question of whether to detain people with a certain but non-observed connection. Leaving that aside, the government suggests on at least five occasions today that that observed connection is sufficient to give rise to reasonable suspicion. That was not the basis on which this Court adopted its categorical rule in Summers. If it had been, the discussion of the special law enforcement interests supporting the rule would have been entirely superfluous. And it's for that reason we would respectfully submit that the Court made clear in footnote 19 that Summers permits officers to detain individuals regardless of the quantum of proof justifying the detention of specific individuals. And this Court's subsequent cases applying Summers have made clear that Summers permits the detention of individuals with no apparent connection to the criminal activity being investigated. And that leads into my second point, which is that Terry will serve as a fallback in many of these cases to permit detentions of individuals who are seen leaving the premises where there is a sufficient additional basis to give rise to reasonable suspicion. In fact, it may very well be the exception to the rule that you have a case in which there aren't sufficient additional articulable facts to give rise to reasonable suspicion. We would respectfully submit that this case falls within that exceptional category, but it really underscores why the expansion of Summers that the government is seeking is really unnecessary. I would just note in response to a point that Justice Scalia made, that the fundamental flaw with the government's position is that it really can't be reconciled with any original understanding of the Fourth Amendment. There's no historical evidence suggesting that officers at the time of the founding or thereafter when executing search warrants detained the occupants of the premises. And the problem with the government's approach is that it really would convert any search warrant into a search and seizure warrant. It really would suggest that there is a freestanding right to detain anyone with a connection or an observed connection to the place to be searched that operates alongside the warrant-conferred right to conduct the search. Alito, would you say the same thing about the exact situation in Summers? No, we wouldn't, Justice Alito. You think there was a — the original understanding was that what happened in Summers was okay, but if you get out of the immediate vicinity, that's where they drew the line? Well, we're not challenging the rule of Summers itself. We're simply suggesting that there is no historical basis for that rule, and for that reason, we think that any expansion of Summers would really be of questionable validity. In Summers itself, the detention was truly incident to the execution of the warrant, because after all, the officers were approaching the house and literally just about to effectuate entry when the detention was taking place. Well, you can say that there was a historical basis for the rule in that officers have always been allowed to take necessary action to protect themselves. And that's the principal justification. Perhaps, but we have been unable to find any examples of detentions of occupants of the premises until at least 1880. And our point is simply that the detention ceases to be truly incident to the search where the individual has left the scene. The justifications for the detention evaporate at that point. Thank you. Thank you, counsel. The case is submitted.